# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **ADAN TORRES-NIEVES**, <br><br> Defendant. | Case No. 3:17-cr-00386-SI <br><br> **OPINION AND ORDER** |

Billy J. Williams, United States Attorney, and William M. Narus and Lewis S. Burkhart, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

John Gutbezahl, LAW OFFICE OF JOHN E. GUTBEZAHL, 5 Centerpointe Dr., Suite 400, Lake Oswego, OR 97035. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Defendant Adan Torres-Nieves ("Torres") moves to suppress evidence obtained by law enforcement during the execution of a search warrant and further moves to suppress all statements he made during a custodial interrogation and all evidence recovered as a result of Defendant's statements. The government opposes both motions. The Court held an evidentiary hearing on February 11, 2019. For the reasons that follow, Defendant's motions are both DENIED.

## STANDARDS

### A. Search Warrants

The Fourth Amendment requires that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized." U.S. Const., amend. IV. A search warrant is supported by probable cause if the issuing judge finds that, "given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As the Court now tasked with reviewing the issuing judge's finding of probable cause, we must "simply ensure that the [issuing judge] had a 'substantial basis for . . . concluding' that probable cause existed." *Id.* at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). We give great deference to an issuing judge's finding that probable cause supports a warrant. *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011); *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) (declaring that courts "are not in a position to flyspeck the affidavit through de novo review").

An affidavit must consist of more than conclusory statements and bare-bones assertions. *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013). Instead, the affidavit "must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination." *Id*. Whether or not probable cause exists "depends upon the totality of the circumstances, including reasonable inferences, and is a 'commonsense practical question.'" *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (quoting *Gourde*, 440 F.3d at 1069). "[P]robable cause means 'fair probability,' not certainty or even a preponderance of the evidence." *Gourde*, 440 F.3d at 1069.

Even when a warrant is unsupported by probable cause, suppression of the fruits of an unconstitutional search is not necessary if the officers relied on the warrant in good faith. *United States v. Leon*, 468 U.S. 897, 919-20 (1984). In *Leon*, the Supreme Court explained that, "where

police conduct is 'pursued in complete good faith,' the [exclusionary] rule's deterrent function 'loses much of its force.'" *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006) (quoting *Leon*, 468 U.S. at 919). The exclusionary rule thus does "not bar the government's introduction of evidence obtained by officers acting in objectively reasonable reliance on a search warrant that is subsequently invalidated." *Id.* The good faith inquiry is an objective one, requiring a court to ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23.

**B.  *Miranda* Warnings**

"For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's waiver of *Miranda* rights must be voluntary, knowing, and intelligent. A valid waiver of *Miranda* rights depends upon the totality of the circumstances including the background, experience, and conduct of defendant." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (citations and quotation marks omitted). The government must prove by a preponderance of the evidence that a valid *Miranda* waiver occurred. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

> To satisfy this burden, the prosecution must introduce sufficient evidence to establish that under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it. The government's burden to make such a showing is great, and the court will indulge every reasonable presumption against waiver of fundamental constitutional rights.

*Garibay*, 143 F.3d at 536-37 (citations and quotation markes omitted). "In determining whether a defendant knowingly and intelligently waived his *Miranda* rights, we consider, as one factor, any language difficulties encountered by the defendant during custodial interrogation." *Id*. at 537.

In applying the totality of the circumstances test, courts consider:

PAGE 3 – OPINION AND ORDER

> (1) whether the defendant signed a written waiver; (2) whether the
> defendant was advised of his rights in his native tongue; (3)
> whether the defendant appeared to understand his rights; (4)
> whether a defendant had the assistance of a translator; (5) whether
> the defendant's rights were individually and repeatedly explained
> to him; and (6) whether the defendant had prior experience with
> the criminal justice system.

*Id*. at 538 (citations omitted).

## C.  Requests for Counsel

The right to counsel established in *Miranda* does not arise under the Sixth Amendment right to counsel in criminal proceedings, but instead is one of a series of "procedural safeguards . . . to insure that the right against compulsory self-incrimination was protected." *Davis v. United States*, 512 U.S. 452, 456-57 (1994) (internal citation omitted); *see* U.S. Const., amend. V. When a suspect knowingly and voluntarily waives his *Miranda* rights, law enforcement officers are free to question him. "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* at 458; *see Edwards v. Arizona*, 451 U.S. 477, 485 (1980). This "prophylactic rule" requires courts to "determine whether the accused *actually invoked* his right to counsel." *Davis*, 512 U.S. at 458 (emphasis in original) (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam)). "Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459 (internal citation omitted). If, however, a suspect makes an ambiguous or equivocal reference to an attorney, police need not immediately cease questioning. *Id.*

# FINDINGS OF FACT

In 2017, the Blue Mountain Enforcement Narcotics Team ("BENT") began to suspect that Defendant was a supplier of methamphetamine to Carlos Cisneros-Razo. Officers soon began to surveil Defendant and Cisneros-Razo.

On May 18, 2017, BENT investigators directed a confidential informant ("CI") to purchase methamphetamine from Cisneros-Razo. Investigators, however, directed the CI to request a greater amount of methamphetamine than Cisneros-Razo was believed to possess. BENT investigators met with the CI at a predetermined location near Milton-Freewater, Oregon. The CI then traveled to Cisneros-Razo's home and requested three ounces of methamphetamine. Cisneros-Razo told the CI that he only had one ounce of methamphetamine on hand, but that he could obtain more from his source of supply. The CI left Cisneros-Razo's house and returned to the BENT investigators and relayed this conversation to them.

During this same timeframe, investigators had set up surveillance at Defendant's house and along the route from Defendant's house to Cisneros-Razo's house. Investigators observed Defendant depart from his home and travel to Cisneros-Razo's home. Defendant met with Cisneros-Razo in his home. Defendant then left Cisneros-Razo's home and returned to his own home. Shortly thereafter, the CI received a phone call from Cisneros-Razo. Cisneros-Razo told the CI that he now possessed three ounces of methamphetamine. The CI traveled to Cisneros-Razo's home and purchased three ounces of methamphetamine for $1,200.

Investigators maintained their surveillance of Defendant. After the CI completed the controlled buy from Cisneros-Razo, investigators observed Defendant again leave his home and travel to Cisneros-Razo's house. Defendant parked his car in front of Cisneros-Razo's house and Cisneros-Razo got into Defendant's car. After a period of time, Cisneros-Razo got out of Defendant's car and returned to his house.

On May 19, 2017, investigators obtained search warrants for Cisneros-Razo's house, Defendant's house, and Defendant's vehicle from a Umatilla County Circuit Court Judge. Investigators planned to execute the search warrants on May 24, 2017. On that day, however, investigators observed Defendant leave his home with a duffel bag, place the duffel bag in the bed of his truck, and drive away from his home. It is unknown where Defendant went. Later that morning, the CI traveled to Cisneros-Razo's house and requested four ounces of methamphetamine. Cisneros-Razo told the CI that he only had two ounces of methamphetamine available and that his source of supply had just left on a trip to California, but would be back the next day. The investigators decided not to execute the search warrants and returned the warrants unexecuted. Defendant returned to his home on May 25, 2017.

On May 25, 2017, Detective Jesse Myer of the Milton-Freewater Police Department submitted an affidavit in support of a warrant to search Defendant's person, home, and any vehicles located at Defendant's home or registered to him, as well as any containers that could contain methamphetamine. A judge authorized the search warrant and allowed it to be executed within ten days.

On May 31, 2017, the CI called Cisneros-Razo and ordered eight ounces of methamphetamine, though investigators believed that Cisneros-Razo only possessed four ounces. Cisneros-Razo told the CI to come to his house in an hour to pick up the methamphetamine. About forty minutes later, investigators observed Defendant leave his home and drive to Cisneros-Razo's home and go inside. After about ten minutes, Defendant left Cisneros-Razo's home and drove away. Several minutes later, Pendleton Police Detective Hubel and Oregon State Trooper Arroyo conducted a traffic stop of Defendant. Simultaneously, authorities began to execute the search warrant of Defendant's home.

Trooper Arroyo, in uniform, got out of the unmarked police vehicle that he and Detective Hubel had been driving and approached the driver's side window of Defendant's car, speaking to Defendant first in English and then in Spanish to ensure that Defendant could understand him. Trooper Arroyo asked Defendant to step out of his vehicle and speak with them. Trooper Arroyo testified that at no point during his interaction with Defendant did he recall hearing Defendant request an attorney and that he believed he would remember if a suspect did request an attorney.[1] The Court finds Trooper Arroyo's testimony credible.

Defendant got out of the car, and he and Trooper Arroyo joined Detective Hubel on the sidewalk. Trooper Arroyo conducted a pat-down search for weapons and placed Defendant in handcuffs. Trooper Arroyo spoke to Defendant in both Spanish and English and confirmed with Defendant that he could speak and understand English. Detective Zuniga then arrived on the scene and parked his car directly behind Trooper Arroyo's car. Detective Zuniga's car was equipped with a dashboard video camera that captured video, but was too far away to pick up any audio of the traffic stop. Detectives Reyna and Salinas from the Walla Walla Police Department soon arrived on the scene.

Detective Hubel, who speaks no Spanish, then read Defendant his *Miranda* rights in English. Defendant disputes that he was ever read his *Miranda* rights, but the Court finds by a preponderance of the evidence that Detective Hubel read Defendant his *Miranda* rights. The dashboard camera footage shows Detective Hubel pull out a small notebook and flip to the first

---

[1] Defendant testified that he told Trooper Arroyo, "If you don't tell me why I'm being arrested, then I want an attorney." The Court did not find Defendant's testimony credible, but even if Defendant had made such a conditional statement to Trooper Arroyo, it would not constitute an unambiguous and unequivocal request for an attorney. *Davis*, 512 U.S. at 458; *United States v. Mohn*, 772 F.3d 1143, 1145-46 (8th Cir. 2014) (holding conditional statement "if you want this recorded, I want a lawyer present" ambiguous and insufficient to invoke right to counsel).

page. Detective Hubel testified and submitted evidence to support the fact that the first page of his notebook contains a small card with the text of *Miranda* rights printed on it. The video shows Detective Hubel appearing to read from his notebook and to write something down. Detective Hubel's notebook, and a subsequent note on a legal pad, show a notation that reads "Torres, Adan," "11:48," "Yes, I do," and "No." Detective Hubel testified that after he read Defendant his *Miranda* rights, he asked Defendant if he understood them, to which Defendant responded "Yes, I do," and he asked Defendant if he had any questions, to which Defendant responded, "No." Detective Hubel testified that he put these words inside quotation marks because they reflected Defendant's verbatim answers.

Defendant also testified that he repeatedly asked for an attorney. Neither Trooper Arroyo, Detective Hubel, nor Detective Zunigas recalled hearing Defendant ask for an attorney. Detective Hubel's notes do not contain any notation that Defendant asked for an attorney. The Court finds that by a preponderance of the evidence that Defendant did not ask for an attorney.

Detective Hubel then recieved Defendant's consent to search Defendant's vehicle and recovered four cell phones. A further search of Defendant's pockets revealed another cell phone and several thousand dollars in cash. Defendant gave Detective Hubel the phone numbers and passcode for the phones, and Detective Hubel wrote them down in his notebook as well. All of the conversation between Defendant and Detective Hubel was conducted in English.

Defendant was then transported to the Milton-Freewater Police Department, where he was interviewed, while in custody, by Detective Salinas and Detective Reyna. This interview was audio recorded and conducted almost entirely in Spanish. Defendant was not re-read his *Miranda* rights before the interview. At no point during the 52-minute long interview did Defendant mention an attorney. During the interview, Defendant offered to help the officers in

their investigation and repeatedly offered to show the police around his home and help them find drugs. After the interview, detectives drove Defendant to his home.

When Defendant arrived at his home, investigators had not yet finished searching the house, but they had already located a bag of drugs inside a lawnmower in Defendant's garage. Defendant directed officers to a green Nissan Pathfinder in the garage, which had not yet been searched. At the time of the traffic stop, Defendant had the keys to the Nissan Pathfinder in his pocket. Investigators retrieved the keys and provided them to Defendant in the garage. He unlocked the Nissan Pathfinder and showed the investigators cocaine, heroin, methamphetamine, and other contraband. Inside of the Nissan Pathfinder, officers recovered the vehicle's registration, which listed Defendant as a co-owner of that car.

## CONCLUSIONS OF LAW

### A. Warrant

Defendant argues that the affidavit in support of the search warrant relies too heavily on conclusory statements, rather than underlying facts, and therefore cannot support probable cause. The affidavit, however, is much more specific than Defendant's characterization and describes in detail a controlled purchase of methamphetamine from Cisneros-Razo.

The specific facts contained in the affidavit support a reasonable inference that Cisneros-Razo was able to obtain methamphetamine from Defendant. Cisneros-Razo did not have enough methamphetamine to complete the CI's purchase before Defendant arrived at his house; after Defendant left Cisneros-Razo's house, Cisneros-Razo did have enough methamphetamine. Detective Myer also explains in the affidavit that, based on his training and experience, Defendant's second trip to Cisneros-Razo's house, where Cisneros-Razo met with Defendant inside Defendant's car, is consistent with Cisneros-Razo paying Defendant for the methamphetamine. Cisneros-Razo told the CI that he would obtain methamphetamine from his

PAGE 9 – OPINION AND ORDER

"source of supply" and an issuing judge could conclude from these facts that Cisneros-Razo obtained methamphetamine from Defendant. Therefore, there is a reasonable inference that Defendant is, in fact, Cisneros-Razo's source of supply. The Ninth Circuit has upheld similar investigative tactics involving controlled buys from drug trafficking middlemen to establish probable cause to search a suspected drug supplier's home. *See United States v. Chavez-Miranda*, 306 F.3d 973, 976-79 (9th Cir. 2002) (finding probable cause after police observed defendant arrive at drug dealer's home shortly after informant requested large quantity of drugs and drug dealer told informant that he now had the drugs within minutes of defendant's arrival).

Defendant argues that the affidavit failed to include any specific times at which the events occurred, and thus the affidavit was insufficient to show probable cause. Instead, the affidavit uses general temporal descriptors like "a reasonable amount of time" and "shortly thereafter." But the fact that Cisneros-Razo called the CI to tell the CI that he now had the requested amount of methamphetamine "shortly thereafter" Defendant left his house conveys a sufficiently close temporal proximity that gives rise to an inference that Defendant was the supplier of the methamphetamine. The affidavit's frequent reliance on "a reasonable amount of time" to describe the sequence of events is imprecise, but it does not undermine the reasonable inferences that can be drawn from the facts stated in the affidavit. Defendant argues that this imprecise time frame undermines a finding of probable cause because if a lengthy amount of time passed before Defendant left Cisneros-Razo's house, somebody else could have arrived at the house and supplied Cisneros-Razo with the methamphetamine. But there is no mention of

anyone other than Defendant visiting Cisneros-Razo's house between the time Cisneros-Razo did not have the methamphetamine and the time he did.[2]

Defendant also challenges the reliability of the Cisneros-Razo's statements as double-hearsay and argues that they are insufficient to establish probable cause. But "[h]earsay reported by informants is no bar to a finding of probable cause." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986). It is the task of the reviewing magistrate to evaluate the "'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Gates*, 462 U.S. at 238. "When the circumstances suggest veracity, such as an admission against penal interest, a statement made to an informant may be considered reliable." *Angulo-Lopez*, 791 F.2d at 1397. Cisneros-Razo's statements were highly incriminating and were corroborated by the fact that he was able to supply the CI with methamphetamine in exchange for money only after Defendant's visit. Cisneros-Razo's statements, and his direct involvement in the sale of methamphetamine to the CI, provide sufficient indicia of veracity to establish probable cause.

Finally, Defendant argues that any evidence seized from the Nissan Pathfinder should be suppressed because the search warrant was overbroad in its direction to search all vehicles operated by, controlled by, or registered to Defendant, and all vehicles located at his house. Although the affidavit does not mention the Nissan Pathfinder specifically, the warrant establishes probable cause to believe that Defendant is a source of supply for methamphetamine and that he drives to and from controlled substances transactions. It is reasonable, therefore, to believe that Defendant may keep contraband in his home, on his property, in his cars, or even in

---

[2] If another individual had arrived at Cisneros-Razo's house during that time period and that person's presence was omitted from the affidavit, that would would likely raise concerns as to the validity of the warrant under *Franks v. Delaware*, 438 U.S. 154 (1978). Defendant, however, does not allege that anyone other than himself visited Cisneros-Razo's house during the relevant period.

his garage. *See United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004); *Angulo-Lopez*, 791 F.2d at 1399 ("In the case of drug dealers, evidence is likely to be found where the dealers live."). The Ninth Circuit has approved of search warrants for a vehicle when the evidence suggested that the vehicle's owner was a drug dealer. *United States v. Spearman*, 532 F.2d 132, 133 (9th Cir. 1976) (per curiam); *see also United States v. Elliott*, 322 F.3d 710, 716 (9th Cir. 2003) (approving of *Spearman*). The warrant authorizing the search of the house, curtilage, vehicles, and containers located at the address in which contraband could be stored was reasonable under the circumstances and not overbroad. *See United States v. Alexander*, 761 F.2d 1294, 1301 (9th Cir. 1985).[3]

Though not necessary to the Court's analysis, reliance on the warrant was additionally protected as a good faith reliance on a warrant that was not deficient on its face. *See Leon*, 468 U.S. at 926. Accordingly, the Court finds that the evidence uncovered during the search pursuant to the warrant, including the evidence recovered from the Nissan Pathfinder, need not be suppressed.

**B. *Miranda***

The Court concludes by a preponderance of the evidence that Detective Hubel timely read Defendant his *Miranda* rights and that Defendant stated that he understood his rights and had no questions. A valid *Miranda* waiver can occur even when agents "neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights." *United States v.*

---

[3] The Nissan Pathfinder was registered to Defendant as a co-owner and therefore was expressly covered by the search warrant. Officers did not verify that the Nissan Pathfinder was registered to Defendant before Defendant offered to unlock the Nissan Pathfinder, but officers could have verified registration from the license plate of the Nissan Pathfinder and confirmed that the car was registered to Defendant as a co-owner. It is reasonable to conclude that officers would inevitably have searched the Nissan Pathfinder and uncovered contraband, even if Defendant had not shown them where the contraband was hidden and consented to the search. *See Nix v. Williams*, 467 U.S. 431, 447 (1984).

*Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997). A waiver need not be audio-recorded to be valid. *See id.* (holding that a "recitation of the rights . . . accompanied by the officer's confirming that [defendant] understood his rights, is sufficient to establish that [defendant] knew his rights"). Defendant's waiver was knowing and intelligent even though Detective Hubel read the *Miranda* rights in English. Defendant confirmed to Trooper Arroyo that he could speak English and he communicated with Detective Hubel in English during the traffic stop. The government has shown by a preponderance of the evidence that Defendant can speak and understand English. Furthermore, Defendant testified that he would be able to understand his *Miranda* rights if they were read to him in English. Defendant, who came to the United States in 1983, also has a twenty-year history with the criminal justice system, which suggests that he understands the rights of a criminal defendant. *See Garibay*, 143 F.3d at 537. Accordingly, Defendant validly waived his *Miranda* rights.

Defendant maintains that he should have been given the *Miranda* warnings again when the recorded interview at the police station began. But the Supreme Court has eschewed a per se rule requiring that officers re-advise a defendant of his *Miranda* rights after the passage of time or a shift in questioning. *See Wyrick v. Fields*, 459 U.S. 42, 48 (1982) (per curiam). The Ninth Circuit has held that "a *Miranda* warning does not lose its efficacy if a defendant is warned by one officer and then interrogated by another." *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995) (holding a one-day break between *Miranda* warning and interrogation does not nullify *Miranda* warning); *Guam v. Dela Pena*, 72 F.3d 767, 770 (9th Cir. 1995) (holding fifteen hour break between *Miranda* warning and questioning did not render confession inadmissible). Defendant was questioned at the police station less than two hours after he was initially

Mirandized. The initial *Miranda* waiver was still valid, and Defendant's statements made during the recorded interview need not be suppressed.

**C. Counsel**

Finally, because the Court finds that Defendant did not invoke his right to counsel, the officers were under no obligation to cease questioning of Defendant. *Davis*, 512 U.S. at 458 ("If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him.").

## CONCLUSION

Defendant's Motion to Suppress Evidence (Warrant) (ECF 19), Motion to Suppress Statements (ECF 18), and Amended Motion to Suppress Statements and Search (ECF 29) are DENIED.

**IT IS SO ORDERED**.

DATED this 13th day of February, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge